**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **MICHELLE L. NAVIGATO,** | ) | |
| **Trustee of the Giurbino 2005** | ) | |
| **Irrevocable Trust,** | ) | |
| | ) | **CIVIL ACTION** |
| **Plaintiff,** | ) | |
| | ) | **Case No. 09-2101-DJW** |
| **v.** | ) | |
| | ) | |
| **SJ RESTAURANTS, LLC,** | ) | |
| **OZARK RESTAURANTS, INC.,** | ) | |
| **RESTAURANT SYSTEMS, INC., and** | ) | |
| **TABLE ROCK RESTAURANTS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Michelle L. Navigato, Trustee of the Giurbino 2005 Irrevocable Trust, brings this breach of commercial lease contract action against Defendants SJ Restaurants, LLC, Ozark Restaurants, Inc., Restaurant Systems, Inc., and Table Rock Restaurants, LLC. In addition, Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems assert counterclaims against Defendant Table Rock for indemnification under an asset purchase agreement and an assignment and assumption of lease.

In sum, this case involves a Lease Agreement for a commercial property located in Parsons, Kansas, which was operated as a KFC fast food restaurant. Defendant SJ Restaurants was the original tenant under the Lease Agreement, and Defendants Ozark Restaurants and Restaurant Systems signed Guarantys obligating themselves as guarantors under the terms and conditions of the Lease Agreement. Non-party Parsons KFC, LLC, the original landlord under the Lease Agreement, eventually assigned all of its interest in the Lease Agreement to Plaintiff, the current landlord. Approximately one year later, Defendant SJ Restaurants assigned all of its interest in the

Lease Agreement to Defendant Table Rock, who assumed the duties and obligations as the tenant under the Lease Agreement.

This case arises out of Defendant Table Rock's default under the Lease Agreement for non-payment of rent and abandonment of the subject premises. Plaintiff is suing Defendants SJ Restaurants and Table Rock for breach of the Lease Agreement, and Defendants Ozark Restaurants and Restaurant Systems on the Guarantys. Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems have asserted counterclaims against Defendant Table Rock for indemnification.

This Court held a bench trial on July 26, 2010. The parties completed post-trial briefing, and the Court has reviewed the briefs submitted by the parties. The Court is now prepared to issue its findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT

### A. The Parties

Plaintiff Michelle L. Navigato ("Plaintiff") is a trustee of an irrevocable trust, the Giurbino 2005 Irrevocable Trust, with a situs in the State of California. Plaintiff is married to Chris Navigato.

Defendant SJ Restaurants, LLC ("SJ Restaurants") is a Missouri limited liability company authorized to do business and/or doing business in the State of Kansas. Defendant Ozark Restaurants, Inc. ("Ozark Restaurants") is a Missouri corporation authorized to do business and/or doing business in the State of Kansas. Defendant Restaurant Systems, Inc. ("Restaurant Systems") is a Missouri corporation authorized to do business and/or doing business in the State of Kansas. Defendant Table Rock Restaurants, LLC ("Table Rock") is a Delaware limited liability company authorized to do business and/or doing business in the State of Kansas.

### B. The Lease Agreement

On or about February 8, 2005, Parsons KFC, LLC, a Missouri limited liability company, as Landlord, entered into a Lease Agreement with Defendant SJ Restaurants, as Tenant, for the lease of commercial property in Parsons, Kansas, located at 1201 South Main Street, Parsons, Labette County Kansas, with all improvements thereon, as more particularly described as follows:

> Lots 13, 14, 15 and 16, Block 181, City of Parsons, Labette County, Kansas, according to the recorded plat thereof. Subject to all easements, restrictions, covenants and rights-of-way of record.

(referred to hereafter as the "subject premises").

During its occupancy of the subject premises, Defendant SJ Restaurants operated a KFC fast food restaurant.

The Lease Agreement was for an original term of 20 years (the "Primary Term") commencing February 8, 2005. The rent agreed to in the first through fifth years for the Primary Term of the lease was the sum of $70,200.00 per lease year payable in equal monthly installments of $5,850.00. During the sixth through tenth lease years of the Primary Term, the rent increased to monthly installments of $6,288.75. During the eleventh through fifteenth lease years of the Primary Term, the rent increased to monthly installments of $6,760.40. Finally, during the sixteenth through twentieth lease years of the Primary Term, the rent increased to monthly installments of $7,267.43.

The Lease Agreement was a triple net lease, meaning that the Tenant was responsible for (1) all maintenance and repairs and for payment of the cost thereof, (2) payment of all real estate taxes on the subject premises when due, and (3) payment of all fire and extended coverage and liability insurance premiums on the subject premises when due.

The Lease Agreement does not contain an acceleration provision or mechanism for the collection of future rents by the Landlord.

## C.    The Guarantys

On or about February 8, 2005, Defendant Ozark Restaurants executed a Guaranty to Parsons KFC, LLC, the original Landlord, obligating itself as Guarantor under the terms and conditions of the Lease Agreement.  On or about that same date, Defendant Restaurant Systems also executed a Guaranty to Parsons KFC, LLC, the original Landlord, obligating itself as Guarantor under the terms and conditions of the Lease Agreement.

The liability of Defendants Ozark Restaurants and Restaurant Systems on their Guarantys is direct, immediate, absolute, continuing, unconditional and unlimited, and not conditional or contingent upon the pursuit by the Landlord of whatever remedies it may have against the Tenant or its successors and assigns.  In addition, under both Guarantys, upon any default in the performance by Tenant of its obligations under the Lease Agreement, when due, the Landlord may proceed directly against Defendants Ozark Restaurants and Restaurant Systems without first taking any steps against the Tenant and without any prior demand or notice. Both Guarantys cover not only the performance by Tenant of its obligations under the Lease Agreement, but also all costs and expenses, including reasonable attorney's fees, incurred by Landlord in collecting against Defendants Ozark Restaurants and Restaurant Systems under their Guarantys.

Both Guarantys bind the successors and assigns of Defendants Ozark Restaurants and Restaurant Systems and inure to the benefit of the Landlord and its successors and assigns.  Finally, both Guarantys continue in full force and effect until Tenant has fully performed all of its obligations, covenants and agreements under the Lease Agreement.

## D.    Assignment of the Lease Agreement to Plaintiff

Under the Lease Agreement, the Landlord may assign the Lease Agreement without the consent of the Tenant. On or about February 9, 2006, Parsons KFC, LLC, the original Landlord under the Lease Agreement, sold the subject premises and assigned all of its interest in the Lease Agreement to Plaintiff. As such, Plaintiff succeeded to all rights as Landlord under the Lease Agreement, including but not limited to the right to receive all rental and other payments owed by the Tenant under the Lease Agreement.

After February 9, 2006, rent payments were made directly to Plaintiff as Landlord.

**E.      Assignment to Defendant Table Rock**

Approximately one year after Plaintiff became the Landlord under the Lease Agreement, Defendant SJ Restaurants, the original Tenant under the Lease Agreement, assigned all of its interest in the Lease Agreement to Defendant Table Rock. More specifically, on or about February 6, 2007, Defendant Table Rock executed and entered into the Asset Purchase Agreement, whereby Defendant Table Rock agreed to purchase and assume certain assets, liabilities and obligations of Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems, including the Lease Agreement at issue in this case.

In addition, a few months later, on or about May 7, 2007, Defendants Table Rock and SJ Restaurants entered into the Assignment and Assumption of Lease, wherein Defendant SJ Restaurants assigned all of its interest in the Lease Agreement to Defendant Table Rock, and Defendant Table Rock assume the duties and obligations as the Tenant under the Lease Agreement. Pursuant to the Assignment and Assumption of Lease, Defendant Table Rock agreed to keep, observe and perform all of the covenants, terms and conditions required to be kept, observed and

performed by Defendant SJ Restaurants pursuant to the Lease Agreement to the same effect as if Defendant Table Rock were the original tenant to the Lease Agreement.

F.    Consent to Assignment of Lease Agreement to Defendant Table Rock

Section 26 of the Lease Agreement provides in pertinent part that the Tenant shall not assign the Lease Agreement in whole or in part, or sublet all or any part of the subject premises, without obtaining prior written consent of the Landlord, which consent shall not be unreasonably withheld. Thus, on or about May 9, 2007, Plaintiff and Defendant SJ Restaurants entered into a Consent to Assignment whereby Plaintiff consented to assignment of the Lease Agreement by Defendant SJ Restaurants to Defendant Table Rock.

Under the Consent to Assignment, Plaintiff, as Landlord, and Defendant SJ Restaurants, as the original Tenant and assignor, agreed that, in consideration for Plaintiff's consent to the assignment of the Lease Agreement, for a period of seven years from the date of the Consent to Assignment Defendant SJ Restaurants and its successors would remain primarily liable to Plaintiff for the performance of Defendant Table Rock of all of the Tenant's obligations and duties under the Lease Agreement as though Defendant SJ Restaurants remained as Tenant under the Lease Agreement.

During their respective periods of occupancy of the subject premises in Parsons, Kansas, Defendants SJ Restaurants and Table Rock operated a KFC fast food restaurant. Defendant Table Rock also operated an A&W restaurant at the subject premises.

### G.     Defendant Table Rock's Indemnification Obligations

Defendant Table Rock agreed to indemnify Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems under both the Asset Purchase Agreement and the Assignment and Assumption of lease.

Under Section 11.05 of the Asset Purchase Agreement, Defendant Table Rock is obligated to defend, indemnify and hold harmless Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems, and to reimburse them from and against each and every loss imposed on or incurred by Defendant SJ Restaurants, Ozark Restaurants and Restaurant Systems, directly or indirectly, relating to, resulting from or arising out of (1) any breach or nonperformance of any covenant, agreement or other obligation of Defendant Table Rock under the Asset Purchase Agreement, (2) any liabilities arising from Defendant Table Rock's operation of the Stores after the closing of the Asset Purchase Agreement, and (3) any Assumed Liabilities, including the liabilities and obligations under the Lease Agreement.

Under Paragraph 3(b) of the Assignment and Assumption of Lease, Defendant Table Rock agreed to indemnify, defend and hold Defendant SJ Restaurants and SJ Restaurants' officers, directors, agents, successors and assigns, harmless from and against any and all causes of action, claims, rights, demands, liabilities, losses, damages, judgments, and expenses, including reasonable attorney fees, court costs, and other legal expenses that any of them may incur, whether or not litigation is commenced, arising from, connected with, based upon, relating to or otherwise involving the Lease Agreement on or after May 7, 2007.

### H. Default under the Lease Agreement

Defendant Table Rock failed to make the rent payment required under the Lease Agreement in November 2008 and December 2008. The Lease Agreement provides that in the event of any failure of the Tenant to pay any rental due under the Lease Agreement for more than 10 days after written notice of such non-payment shall have been given to the Tenant, then the Tenant shall be in default under the Lease Agreement and the Landlord shall have the right and option to pursue all of the Landlord's legal remedies. The Lease Agreement further provides that any notice given under the Lease Agreement shall be in writing and may be delivered in person or be sent by certified or registered mail, postage prepaid, addressed to the party to receive same at the address of such party shown on the signature page of the Lease Agreement or such other address as such party may furnish to the other in writing. The Lease Agreement also provides in Section 26 that for a period of two years after any assignment of the Lease Agreement by the original Tenant to an assignee, the Landlord must notify the original Tenant in writing of any claimed default under the Lease Agreement, and the original Tenant shall have the right to cure the default, or to commence such cure provided that the cure is thereafter diligently completed, within 15 days of such notice or the applicable grace period under the Lease Agreement, whichever is longer.

Pursuant to the terms of the Lease Agreement, a Notice of Default is a condition precedent to collection efforts. On or about December 8, 2008, the Notice of Default, addressed to Defendant Table Rock, was sent to Defendant Table Rock by William Bissell, attorney for Plaintiff. A courtesy copy of the Notice of Default was sent to Defendant SJ Restaurants, Ozark Restaurants, and Restaurant Systems, although no Notice of Default was directed to Defendants SJ Restaurants,

Ozark Restaurants, or Restaurant Systems. Defendants SJ Restaurants, Ozark Restaurants and Restaurant Systems admit they received the Notice of Default.

The Notice of Default provides, "You are hereby notified, pursuant to paragraph 17 of that Lease Agreement dated February 8, 2008, for the premises located at 1201 South Main Street Parsons, Labette County Kansas, that you are presently in default under the terms of said lease for failing to pay the rent due thereunder for the months of November and December 2008." The Notice of Default further provides, "You are further notified, that unless the sum of $11,700.00 representing the rent owed for November and December 2008 is received by the Landlord under said lease . . . within ten (10) days of the date of this notice, Landlord shall immediately pursue all rights available to her under the terms of the lease and under law including but not limited to the termination of the lease and the eviction of Table Rock Restaurants, LLC from the premises."

Payment of past-due rent was not made as demanded in the Notice of Default by Defendants Table Rock, SJ Restaurants, Ozark Restaurants, or Restaurant Systems. No rent or other payments owed under the Lease Agreement have been made by Defendants Table Rock, SJ Restaurants, Ozark Restaurants, or Restaurant Systems to Plaintiff from November 2008 through date of trial July 26, 2010.

In addition to its default for failure to pay rent, sometime in late 2008, Defendant Table Rock vacated the subject premises. Defendant Table Rock did not give notice to Plaintiff that it was abandoning the subject premises. Plaintiff did not learn that the subject premises had been vacated until the last week of December 2008, when attorney Richard Tucker, who Plaintiff had contacted to pursue her legal remedies under the Lease Agreement, advised Plaintiff's husband, Chris Navigato, that the subject premises had been vacated. The restaurant operated at the subject

premises by Defendant Table Rock has been closed and is no longer open for business or occupied as a business by any of the defendants.

Defendant Table Rock has defaulted under the terms of the Lease Agreement. At all pertinent times, Plaintiff, as Landlord, performed all conditions precedent under the Lease Agreement.

I.   **Defendant Table Rock's Default under the Asset Purchase Agreement and Assignment and Assumption of Lease**

In late 2008, Defendant Table Rock received multiple health code violations that were printed in the local newspaper, and the restaurant operated on the subject premises was run more by teenagers rather than good managers. Defendant Table Rock failed to make the November 2008 and December 2008 rent payments under the Lease Agreement, and Defendant Table Rock abandoned the subject premises sometime in late 2008. Defendant Table Rock thus defaulted under the Lease Agreement, and Plaintiff subsequently brought this action against Defendants Table Rock, SJ Restaurants, Ozark Restaurants, and Restaurant Systems.

Defendant Table Rock did not defend and indemnify Defendants SJ Restaurants, Ozark Restaurants and Restaurant Systems in connection with Defendant Table Rock's non-payment of rent and abandonment of the subject premises as required under the Asset Purchase Agreement and Assignment and Assumption of Lease. Defendants SJ Restaurants, Ozark Restaurants and Restaurant Systems complied with all conditions precedent under the Asset Purchase Agreement and Assignment and Assumption of Lease. Defendant Table Rock has defaulted under the terms of the Asset Purchase Agreement and Assignment and Assumption of Lease.

**J.      Contractual Monetary Obligations**

There is due and owing to Plaintiff from Defendant Table Rock unpaid lease payments for the remainder of the first twenty year term from November 2008 through February 8, 2025. In addition, under the terms of the Consent to Assignment, Defendant SJ Restaurants owes Plaintiff unpaid lease payments for the period of November 2008 through May 9, 2014. Further, pursuant to the Guarantys, Defendants Ozark Restaurants and Restaurant Systems, as guarantors of the obligations of SJ Restaurants under the Lease Agreement, are also liable for unpaid lease payments for the period of November 2008 through May 9, 2014.

In addition, under the terms and provisions of the Lease Agreement, Defendant Table Rock is liable for certain payments of property taxes, insurance, maintenance, repairs, and leasing costs, for the period of November 2008 through February 8, 2025. Pursuant to the Consent to Assignment, Defendant SJ Restaurants is liable for certain payments of property taxes, insurance, maintenance, repairs, and leasing costs, for the period of November 2008 through May 9, 2014. Further, pursuant to the Guarantys, Defendants Ozark Restaurants and Restaurant Systems, as guarantors of the obligations of SJ Restaurants under the Lease Agreement, are also liable for certain payments of property taxes, insurance, maintenance, repairs, and leasing costs, for the period of November 2008 through May 9, 2014.

**K.      Plaintiff's Mitigation Efforts**

The Lease Agreement provides, "Each party agrees that it has a duty to mitigate damages and covenants that it will use commercially reasonable efforts to minimize any damages it may incur as a result of the other party's performance or non-performance" of the Lease Agreement. In her efforts to mitigate her damages, Plaintiff brought this action against the defendants, hired a real

estate agent to market the property, made additional efforts to market the property, entered into another lease agreement for the subject premises, then pursued her remedies against that tenant when it defaulted, continued to market the property, and at the time of trial was negotiating another lease agreement with a potential tenant. Because Defendants argue that Plaintiff failed to mitigate her damages, a detailed discussion of Plaintiff's mitigation efforts follows.

After Defendant Table Rock's default under the Lease Agreement, Plaintiff retained Richard Tucker, attorney, to pursue Plaintiff's legal remedies against Defendants, including but not limited to obtaining lawful possession of the subject premises. On January 29, 2009, Plaintiff, through her counsel Richard Tucker, filed a civil action against Defendants Table Rock, SJ Restaurants, Ozark Restaurants and Restaurant Systems in Labette County, Kansas District Court seeking remedies for breach of the Lease Agreement, Consent to Assignment, and Guarantys. Defendants then collectively removed this civil action to the United States District Court for the District of Kansas.

Plaintiff and her designated agent, Chris Navigato, live in California and are not familiar with the real estate market in Labette County. Thus, in late January 2009, Plaintiff, through her designated agent Chris Navigato, interviewed Keith Maloney of Finley-Maloney Real Estate L.L.C., a real estate brokerage and real estate sales company located in Parsons, Kansas, regarding marketing the subject premises. Around that same time, Plaintiff, through her designated agent Chris Navigato, advertised the subject premises for lease or for sale by putting a message up on the reader board sign located at the subject premises itself. In addition, around that same time, Plaintiff, through her designated agent Chris Navigato, also advertised the subject premises for lease on LoopNet, a national commercial real estate website.

In late January or early February of 2009, pursuant to the Lease Agreement's default clause, Plaintiff took possession of the abandoned premises without prejudice to Plaintiff's claim for damages for breach of contract, or for arrears of rent, or any other amounts due thereunder.

Plaintiff also attempted to mitigate her damages by contacting Yum! Brands, a national fast food franchiser company, through her designated agent Chris Navigato, to see if there was any interest in the subject premises. Yum! Brands only returned one of Mr. Navigato's telephone calls and did not appear to be interested in the subject premises. Plaintiff did not contact any franchisees in the area of Parsons, Kansas to see if there was any interest in the subject premises.

On March 15, 2009, Plaintiff retained Keith Maloney to serve as a real estate broker for the subject premises and to market the property for sale or for rent. Mr. Maloney did not do any work to market the subject premises before March 15, 2009. After being retained by Plaintiff, Mr. Maloney marketed the subject premises locally for five months, from March of 2009 to July of 2009, including listing the subject premises with the local MLS, adding the subject premises to a local real estate guide when it came up as a two-month publication, advertising the subject premises in the local newspaper, and listing the subject property on his company website. Mr. Maloney also contacted Yum! Brands corporate headquarters. The subject premises was listed for lease for $2,500.00 per month.

Mr. Maloney inserted the following comment into the local MLS listing of the subject premises, "Building is in litigation with KFC for termination of lease. Building might be able to be sold but would require both parties to agree." The parties referred to by Mr. Maloney were Plaintiff and Defendant Table Rock. Mr. Maloney explained that he inserted this comment into the listing because at the time he believed such agreement would be necessary.

From March of 2009 until July of 2009, Mr. Maloney was not contacted by anyone interested in the subject premises. Then, in July of 2009, in response to the LoopNet advertisement, Mr. Navigato was contacted by a potential lessor, Veton Morina, an individual dba Capris Italian Restaurant, and Feim Veseli, an individual (collectively, "Capris"). Mr. Navigato forwarded this information to Mr. Maloney, who followed up and negotiated with Capris. Mr. Maloney recommended that Plaintiff go ahead with the lease with Capris because it was the best opportunity for Plaintiff to get some rent and some occupancy of the subject premises.

Plaintiff's counsel William Bissell negotiated and drafted a lease agreement with Capris. Plaintiff then stopped the LoopNet advertisement and Mr. Maloney ceased his efforts to market the subject premises in July of 2009. Although the lease agreement finally entered into between Plaintiff and Capris is dated September 19, 2009, Capris actually took occupancy of the subject premises in July 2009, and they opened their restaurant the second week of August 2009.

As part of the lease negotiations with Capris, Plaintiff conceded that Capris would occupy the subject premises rent-free for July, August, September, October, and November of 2009. During that time frame, Capris was only responsible for the taxes on the subject premises and was required to pay some escrow money up front. The lease agreement with Capris provides that Capris was to pay Plaintiff $2,100.00 a month for rent from December 1, 2009 to July 31, 2010. The rent then increased to $2,670.00 a month from August 1, 2010 to December 31, 2010. The lease agreement with Capris states, "This lease shall supersede and replace in its entirety any other lease of the" subject premises.

Capris paid rent for December 2009 in the amount of $2,100.00. Capris paid rent for January 2010 in the amount of $2,100.00, although it took awhile to get the rent from them. Capris did not

pay rent or any other amount after January 2010.  In March 2010, Capris advised Plaintiff that the restaurant was not going to survive and that they were vacating the subject premises.

Plaintiff then retained Mr. Tucker to proceed with collection efforts against Capris, and on July 12, 2010, Plaintiff filed a lawsuit in the District Court of Labette County, Kansas against Capris, seeking lease payments for the full term of the lease, which was fifteen months, in the amount of $31,302.  To date, Plaintiff has not been successful in collecting any money from Capris.

Mr. Maloney did nothing to market the subject premises for sale or for lease from July of 2009 to March 2010.  In March of 2010, after Capris defaulted, Plaintiff began the LoopNet advertisement again and Mr. Maloney began marketing the subject premises again for either sale or lease.  The subject premises was initially listed in March 2010 for lease for $2,500.00 per month, however a few months later, per Mr. Maloney's suggestion, Plaintiff reduced the advertised lease rate to $785.00 triple net monthly.

As of the date of the trial, July 26, 2010, Plaintiff did not receive any offers to purchase or any inquiries regarding purchasing the subject premises.  However, as of the date of the trial, Plaintiff was in negotiations with Mi Tierra Mexican Restaurant & Saloon, Inc. ("Mi Tierra") to lease the subject premises.  Per the draft lease terms, Mi Tierra would occupy the subject premises rent-free for August 1, 2010 through August 31, 2010, would pay $738.00 monthly rent for the first year of the lease, and would then pay $1,000.00 monthly rent for the second year of the lease.  The draft lease is intended to be a triple net lease.  According to Keith Maloney, this proposed tenant and the proposed monthly rental rates are the best that presently can be expected for the subject premises.

The Court notes that, as of the date of trial, no reasonable proposal to lease the subject premises has been declined by Plaintiff. The Court further notes that since late January or early February 2009, Plaintiff has secured and maintained the subject premises and kept it in good repair, paid ongoing real estate taxes and insurance on the subject premises, and fully cooperated with Mr. Maloney regarding marketing the subject premises.

**L.      Plaintiff's Damages**

Plaintiff's damages expert, Jay R. Hill, has been a Certified Public Accountant since 1991, and has been accredited in business valuation since 1998. He has 23 years of accounting and business valuation experience and is president of Jay R. Hill & Co. He has performed valuations of restaurant properties, and he has experience assessing rental rates. Mr. Hill is not a certified real estate appraiser, is not a member of the Advanced Appraisal Institute, and he acknowledged that he is not an expert of real estate value. Mr. Hill did not perform an appraisal or a valuation of the subject premises. Rather, Plaintiff retained Mr. Alan McColm to give an expert opinion regarding the fair market value of the subject premises.

Plaintiff retained Mr. Hill to calculate Plaintiff's lost net rent income, which included lost net rent income from November 2008 to August 1, 2010, lost net rent income from August 1, 2010 to May 9, 2014, lost net rent income from August 1, 2010 to February 8, 2025, and out of pocket expenses.

*1.      Lost Net Rent Income From November 2008 to August 1, 2010*

With respect to Plaintiff's lost net rent income from November 2008 to August 1, 2010, Mr. Hill testified that Plaintiff's loss, plus interest, amounted to $119,654.00. The principal balance of unpaid rent for the period of November 2008 through July 2010, is $116,074.00. This figure

includes offset or reduction for all rent received by Plaintiff and from subsequent lessee(s) of the subject premises. Adding prejudgment interest at the contractual rate set out in the Lease Agreement (the prime rate as then published in the Wall Street Journal, which was 3.25 percent), the amount of rent owed as of the end of July 2010 is $119,654.00. This past due rent claim includes $31,302 in rent that Plaintiff is also attempting to collect from Capris.

## 2. Lost Net Rent Income From August 1, 2010 to May 9, 2014, and from August 1, 2010 to February 8, 2025

With respect to Plaintiff's lost net rent income from August 1, 2010 to May 9, 2014, and August 1, 2010 to February 8, 2025, Mr. Hill used two scenarios to calculate this loss.

### (a) Mr. Hill's First Scenario

In the first scenario, Mr. Hill added all scheduled rent payments per the Lease Agreement and subtracted an estimate of mitigating rental income that may be received by Plaintiff during each of these periods. He then discounted these amounts to reflect the time value of money.

#### (i) Calculation of Estimated Mitigating Rental Income

In determining the estimated mitigating rental income, Mr. Hill considered the lease rate for Capris, the A&A Appraisal of the subject premises, conversations with Mr. Gerald R. Maier, J.D., CPA, MAI of Mainland Valuation, Overland Park, Kansas, and conversations with Mr. Keith Maloney. In doing so, Mr. Hill concluded that $1,000 was the appropriate mitigating rental income amount.

Defendants point out that Mr. Hill actually had two reports, one report dated February 13, 2010, and the second, which updated his first report, dated April 2, 2010. Plaintiff relies on Mr. Hill's April 2, 2010 report. Defendants point out that Mr. Hill changed his conclusion as to the appropriate mitigating rental income in his April 2, 2010 report. In his first report, Mr. Hill's

concluded that $2,221 was the appropriate mitigating rental income amount. In reaching this conclusion, Mr. Hill noted that the Capris lease rate starts at $9.46 per square foot and increases to $12.03 per square foot later in the lease. He also noted that he spoke with Ms. Julia Finley, Mr. Keith Maloney's real estate partner, and she quoted him rates for "similar types of properties in the area [ranging between] $8 and $12 per square foot." Mr. Hill also looked to Mr. McColm's Appraisal of the subject premises, which identified "lease rates for similar types of properties in the area" ranging "between $9 and $18 per square foot." Finally, Mr. Hill spoke with Mr. Gerald R. Maier, J.D., CPA, MAI of Mainland Valuation, who thought the range of $8 to $12 per square foot was a "bit high" depending on where the property was located.

After considering all this information, Mr. Hill concluded in his February report that a $10 per square foot rate or $2,221 a month reasonably reflected the maximum average rate of rent per month that Plaintiff could expect to receive in the future from the subject premises. Then, in his second report, which is the report relied upon by Plaintiff, Mr. Hill updated his first report and concluded that the mitigating rental income was $1,000, which equals a rental rate of $4.50 per square foot. Mr. Hill explained the change in his conclusion during trial. He explained that at the time of the February report he thought the maximum average rate Plaintiff would receive was $2,221 and this number did not take into account any vacancies that are likely to occur. Because this was the maximum amount Plaintiff was likely to receive, Mr. Hill used a discount rate at the risk free rate because this stream of income was the best case scenario. He used a discount rate of 4.5 percent. After Capris actually defaulted under its lease agreement with Plaintiff, Mr. Hill revised his first report and concluded that $1,000 was the appropriate mitigating rental income based on

Capris' default. Mr. Hill then increased the discount rate (for a total of 7.5 percent) to account for the likelihood that Plaintiff may get a better rental rate in the future.

*(ii)     Discount Rate*

After concluding that the appropriate mitigating rental income was $1,000, Mr. Hill then took the difference between the contracted rent rates under the Lease Agreement and the $1,000 mitigating rental rate to calculate Plaintiff's loss. Mr. Hill then discounted this amount to reflect the time value of money.

Mr. Hill used a 7.5 percent discount rate to determine the present value of the lost net rent income. Mr. Hill testified as follows as to why he used a 7.5 percent discount rate: "[S]ince the market appears to be unstable . . . but, given the fact that the market may turn around, I went ahead and increased the discount rate by 3 ½ percent to account for that maybe they will recover, you know, 10 years down the line." In his report, Mr. Hill also explained that to determine a reasonable discount rate, he started with a risk-free rate and that U.S. treasury securities are commonly considered risk-free investments. According to Mr. Hill's report, the twenty-year U.S. treasury rate as of February 29, 2010 was 4.48 percent (monthly basis). Mr. Hill also looked to the rate used by Mr. McColm, Plaintiff's appraiser, for the property – 10.4 percent, which anticipates all risks associated with the property. Mr. Hill then concluded in his report that a rate half way between the risk-free rate and the 10.5 percent rate (rounded) was the appropriate discount rate.

*(iii)     Mr. Hill's Conclusion Under the First Scenario*

Mr. Hill concluded under the first scenario that Plaintiff's lost net rent income from August 1, 2010 to May 9, 2014 is $212,186. Mr. Hill further concluded under the first scenario that Plaintiff's lost net rent income from August 1, 2010 to February 8, 2025 is $604,534.

*(b) Second Scenario*

Mr. Hill also calculated Plaintiff's damages using a second scenario, where he assumed that Plaintiff sold the subject premises on August 1, 2010 for $124,000, the value for which the property was appraised on January 10, 2010 by Plaintiff's expert, Mr. McColm. Mr. Hill then calculated the future lost rent income using the contracted rental amounts for the periods in question (August 1, 2010 to May 9, 2014, and August 1, 2010 to February 8, 2025) plus the estimated fair market value of the building. In this second scenario, Mr. Hill assumed that the subject premises was sold at its depressed value because of Defendants' actions, and therefore Mr. Hill calculated the future value of the building and added it to this calculation. Mr. Hill then applied a discount rate of 11 percent to determine the present value of the lost net rent income.

Mr. Hill concluded under the second scenario that Plaintiff's lost net rent income from August 1, 2010 to May 9, 2014 was $252,143. Mr. Hill further concluded under the second scenario that Plaintiff's lost net rent income from August 1, 2010 to February 8, 2025 was $594,979.

*(c)    Mr. Hill's Final Lost Net Rent Conclusion for the Periods August 1, 2010 to May 9, 2014, and August 1, 2010 to February 8, 2025*

In reaching his final conclusion as to Plaintiff's damages for the periods of August 1, 2010 to May 9, 2014, and August 1, 2010 to February 8, 2025, Mr. Hill averaged the amounts reached in the first and second scenarios and concluded that Plaintiff's lost net rent income from August 1, 2010 to May 9, 2014 is $232,200, and lost net rent income from August 1, 2010 to February 8, 2025 is $599,800.

### 3. *Out of Pocket Expenses*

Mr. Hill also calculated Plaintiff's out of pocket expenses by reviewing the actual expenses and calculating pre-judgment interest using the prime rate of 3.25 percent as stated in the Lease Agreement. Mr. Hill did not include his fees, legal expenses, or other expenses that may be incurred by Plaintiff in prosecuting this matter. Mr. Hill concluded that Plaintiff's total out of pocket expenses through 2009 were $20,849.36, which includes interest in the amount of $554.94. Chris Navigato testified that Plaintiff incurred additional out of pocket expenses in 2009 and 2010, in the amount of $23,323.54. Thus, Plaintiff seeks a total of $44,172.90 for out of pocket expenses.

Plaintiff retained her husband, Chris Navigato, to provide services to the Giurbino 2005 Irrevocable Trust relating to enforcement of Plaintiff's rights under the Lease Agreement, the Consent to Assignment, and the Guarantys . Plaintiff's out of pocket expenses include $9,831.54 paid to Chris Navigato for his professional services to Plaintiff, including "communicate with tenant on the lease default," "review documents and strategies," "teleconference with attorney about lease," "property tax reduction, talking to county clerk," "prepare and review lease agreement for Capris," "prepare financial documentation for trial," and "communicate with attorney on default and litigation." Mr. Navigato charged Plaintiff $175 per hour for his services.

In addition, Plaintiff incurred $1,051.52 in February 2010 for Chris Navigato to fly to Kansas City first class and rent a sport utility vehicle, and $468.36 for Chris Navigato to spend two nights at the Hyatt Regency Crown Center. Plaintiff also incurred $1,932.28 in July 2010 for Chris Navigato and Michelle Navigato to fly to Kansas City first class, and $576.64 for two nights at the Westin Crown Center.

#### 4. *Attorney's Fees and Litigation Costs*

Plaintiff is also seeking attorneys' fees incurred in undertaking efforts to minimize damages she incurred as a result of non-performance of the Lease Agreement. This includes $2,810.41 for services performed by Richard G. Tucker of Tucker and Markham for Plaintiff in connection with prosecution of this civil action in Labette County, Kansas before Defendants removed the case to this Court, as well as the lawsuit against Capris. Plaintiff is also seeking $5,375.00 for services performed by William Bissell for Plaintiff in connection with drafting and serving the notice of default, drafting the lease agreement with Capris, and drafting the lease agreement with Mi Tierra. Finally, Plaintiff is seeking $29,468.09 for services performed by counsel of McAnany, Van Cleave & Phillips in connection with this litigation.

Plaintiff is also seeking litigation expenses, including expert witness fees, deposition transcript fees, and copies in the amount of $10,501.80.

#### 5. *Defendants' Expert, Kenneth Jaggers*

Mr. Kenneth Jaggers, Defendants SJ Restaurants', Ozark Restaurants', and Restaurant Systems' damages expert, is the managing director of the Kansas City and St. Louis offices of Integra Realty Resources. He is a state certified real estate and real property appraiser, and is MAI certified, which is the highest designation a person can receive as a real estate appraiser with the Appraisal Institute, the largest professional organization that includes real estate appraisers.

Mr. Jaggers offered no opinion regarding the estimated mitigating rental income. He also did not appraise the subject premises or offer any opinions about the appraisal opinions reached by Mr. McColm. In addition, he did not have any opinions about the future rental value of the subject

premises. Rather, Mr. Jaggers offered an opinion as to the discount rate and as to Mr. Hill's second scenario.

(a) *Discount Rate*

Mr. Jaggers disagrees with the 7.5 percent discount rate used by Mr. Hill in his first scenario. Mr. Jaggers opined that the appropriate discount rate should be 10.3 percent, as opposed to 7.5 percent. According to Mr. Jaggers' report, blending or averaging the risk-free rate (the twenty-year U.S. Treasury rate) with the capitalization rate used by Mr. McColm is not the appropriate manner for determining the discount rate to be applied. Mr. Jaggers' report explains that the risk-free rate does not adequately reflect the risk associated with a non-U.S. Treasury investment.

In determining the appropriate discount rate, Mr. Jaggers searched Integra Realty Resources national Datapoint database and other sources for recent sales of similar properties, seeking sales since November 1, 2008 of Taco Bell, Kentucky Fried Chicken or other chicken franchise restaurants. The search yielded a total of 15 properties, which had an average capitalization rate of 8.75 percent. Mr. Jaggers also reviewed an Industry Data Report – Franchise Finance and Valuation Update – January 2010, prepared by Restaurant Research, LLC. The report provides the results of surveys of investors and lenders on a variety of data including lending rates, equity requirements, loan terms and capitalization rates. The report reflected an average capitalization rate of 9.38 percent as of January 2010 based on the surveys of 25 national market participants. Mr. Jaggers also researched the relationship between capitalization rates and discount rates based upon national surveys conducted by Integra Realty Resources and Korpacz. This researched showed that capitalization rates for retail properties ranged from 7.5 percent to 11.4 percent, with averages ranging from 8.4 percent to 8.8 percent. Based on these indicators, Mr. Jaggers concluded that the

appropriate overall capitalization rate was 9.0 percent. Mr. Jaggers also looked to discount rates for retail properties, which ranged from 7.5 percent to 15 percent, with averages ranging from 9.58 percent to 10.10 percent. The spread between the average capitalization rates and average discount rates ranged from 1.09 percent to 1.50 percent.

Based on all of this information, Mr. Jaggers came up with a market derived discount rate that buyers of fast food restaurant properties will discount the cash flow generated by properties with tenants such as Kentucky Fried Chicken. This market derived discount rate is 10.3 percent.

Using the discount rate of 10.3 percent and Mr. Hill's estimated mitigating rental income amount of $1,000, Mr. Jaggers determined that Plaintiff's damages through May 9, 2014 is $199,461.94.

*(b)     Second Scenario Critique*

Mr. Jaggers opined that Mr. Hill's approach in the second scenario is incorrect. In his report, Mr. Jaggers explained that Mr. Hill, in his second scenario, assumes a sale of the building in addition to the discounted rent loss combined as evidence of the loss. This approach brings to Mr. Hill's determination of lost rents all of the externalities affecting the real estate irrespective of the Lease Agreement, Consent to Assignment, and Guarantys. The lessee or guarantor has no rights in the resale of the property when its lease obligation ceases. Nor does the lessee or guarantor participate in any return of capital. Inherent in the return of capital are ownership risks which are borne by the owner or investor, not the tenant. Mr. Jaggers thus concluded that the externalities which are reflected in the sale price of the real estate are incorrectly included in Mr. Hill's second scenario analysis.

In addition, according to Mr. Jaggers, the future sales price of the real estate either as of May 2014 or February 2025 is simply not relevant to this analysis. Mr. Jaggers testified that in his 20 years of real estate appraisal experience, he has never seen anything resembling Mr. Hill's second scenario.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

This civil action was initially filed in the Labette County, Kansas District Court. Defendants removed the action to federal district court based on diversity of citizenship jurisdiction. This court has subject matter jurisdiction under 28 U.S.C. § 1441(a)-(b) because there is complete diversity of citizenship of the parties, because none of the Defendants are Kansas citizens, and because the amount in controversy exceeds $75,000.00. In addition, the parties have stipulated to personal jurisdiction. The parties have also stipulated that venue properly rests with this Court.

In assessing the parties' claims, the Court notes that a federal court sitting in diversity jurisdiction applies the substantive law and the choice of law provisions of the forum state, which in this case is Kansas.[1]

### B.    Plaintiff's Breach of Lease Agreement Claim Against Defendant Table Rock

To prove its claim for breach of contract under Kansas law, a plaintiff must prove by a preponderance of the evidence that: (1) there was a contract between the parties; (2) there was sufficient consideration to support the contract; (3) the plaintiff was willing to comply with the terms or did comply with the terms of the contract; (4) the other party breached the contract; and (5)

---

[1] *Missouri Pac. R.R. Co. v. K an. Gas & Elec. Co.*, 862 F.2d 796, 798 n.1 (10th Cir. 1988).

plaintiff sustained damages.[2]  In this case, with respect to Plaintiff's claim against Defendant Table Rock, the contract at issue is the Lease Agreement.  Thus, the parties stipulated in the Pretrial Order (ECF No. 42), and the Court finds that in order to prevail on its breach of Lease Agreement claim against Defendant Table Rock, Plaintiff must prove the following essential elements by a preponderance of the evidence: (1) a contractual relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement; (2) a contractual assumption of the duties and obligations of Tenant under the Lease Agreement by Defendant Table Rock; (3) Plaintiff's performance or willingness to perform in compliance with the Lease Agreement; (4) Defendant Table Rock breached the Lease Agreement by non-payment of rent and/or abandonment of the subject premises; and (5) damages to Plaintiff caused by Defendant Table Rock's breach of the Lease Agreement.

The Court concludes that each of the essential elements of Plaintiff's breach of Lease Agreement claim against Defendant Table Rock have been established by a preponderance of the evidence.  First, the Court finds that there is a contractual relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement.  Under the Lease Agreement, the Landlord may assign the Lease Agreement without the consent of the Tenant.  Thus, on or about February 9, 2006, the original Landlord under the Lease Agreement, Parsons KFC, LLC, sold the subject premises, and assigned all of its interest in the Lease Agreement, to Plaintiff.  As such, Plaintiff succeeded to all rights as Landlord under the Lease Agreement, including but not

---

[2] *City of Andover v. Sw. Bell Tel., L.P.*, 37 Kan.App.2d 358, 362 (Kan. Ct. App. 2007) (citing PIK Civ.3d 124.01).

limited to the right to receive all rental and other payments owed by the Tenant under the Lease Agreement.

Second, the Court finds that Defendant Table Rock contractually assumed the duties and obligations of the Tenant under the Lease Agreement. Defendant Table Rock executed and entered into the Asset Purchase Agreement, whereby Defendant Table Rock agreed to purchase and/or assume certain assets, liabilities and obligations of Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems, including the Lease Agreement. In addition, Defendants Table Rock and SJ Restaurants entered into the Assignment and Assumption of Lease, wherein Defendant SJ Restaurants assigned all of its interest in the Lease Agreement to Defendant Table Rock, and Defendant Table Rock assume the duties and obligations as the Tenant under the Lease Agreement.

Third, the Court finds that Plaintiff performed or demonstrated a willingness to perform in compliance with the Lease Agreement. There has been no evidence to the contrary.

Fourth, the Court finds that Defendant Table Rock breached the Lease Agreement by non-payment of rent and by abandoning the subject premises. Defendant Table Rock failed to make the rent payment required under the Lease Agreement in November 2008 and December 2008. The Lease Agreement provides that in the event of any failure of the Tenant to pay any rent due under the Lease Agreement for more than 10 days after written notice of such non-payment shall have been given to the Tenant, then the Tenant shall be in default under the Lease Agreement and the Landlord shall have the right and option to pursue all of the Landlord's legal remedies. Thus, pursuant to the terms of the Lease Agreement, a Notice of Default is a condition precedent to collection efforts. On or about December 8, 2008, the Notice of Default, addressed to Defendant Table Rock, was sent to Defendant Table Rock by William Bissell, attorney for Plaintiff. A courtesy copy of the Notice

of Default was sent to Defendant SJ Restaurants, Ozark Restaurants, and Restaurant Systems.

The Notice of Default provides, "You are hereby notified, pursuant to paragraph 17 of that Lease Agreement dated February 8, 2008, for the premises located at 1201 South Main Street Parsons, Labette County Kansas, that you are presently in default under the terms of said lease for failing to pay the rent due thereunder for the months of November and December 2008." The Notice of Default further provides, "You are further notified, that unless the sum of $11,700.00 representing the rent owed for November and December 2008 is received by the Landlord under said lease . . . within ten (10) days of the date of this notice, Landlord shall immediately pursue all rights available to her under the terms of the lease and under law including but not limited to the termination of the lease and the eviction of Table Rock Restaurants, LLC from the premises."

Payment of past-due rent was not made as demanded in the Notice of Default by Defendants Table Rock, SJ Restaurants, Ozark Restaurants, or Restaurant Systems. No rent or other payments owed under the Lease Agreement have been made by Defendants Table Rock, SJ Restaurants, Ozark Restaurants, or Restaurant Systems to Plaintiff from November 2008 through the date of trial, July 26, 2010.

Furthermore, sometime in late 2008, Defendant Table Rock vacated the subject premises. Defendant Table Rock did not give notice to Plaintiff that it was abandoning the subject premises. Plaintiff did not learn that the subject premises had been vacated until the last week of December 2008, when attorney Richard Tucker, who Plaintiff had contacted to pursue her legal remedies under the Lease Agreement, advised Plaintiff's husband, Chris Navigato, that the subject premises had been vacated. The restaurant operated at the subject premises by Defendant Table Rock has been closed and is no longer open for business or occupied as a business by any of the defendants. At

all pertinent times, Plaintiff, as Landlord, performed all conditions precedent under the Lease Agreement. Defendant Table Rock has defaulted under the terms of the Lease Agreement.

Fifth, and finally, the Court finds that Plaintiff has sustained damages as a direct result of Defendant Table Rock's breach of the Lease Agreement. The exact amount of Plaintiff's damages will be discussed below. The Court notes that Defendant Table Rock did not present any evidence at trial contesting its liability for breach of the Lease Agreement.

The Court also notes that Defendants all argue that when Plaintiff leased the subject premises to Capris in July of 2009 and entered into a lease agreement with Capris, that Defendants were each relieved of any further obligations under the Lease Agreement, Consent to Assignment, and Guarantys. Defendants rely on the language in the Capris lease agreement, which states, "This lease shall supersede and replace in its entirety any other lease of the" subject premises. Defendants cite absolutely no case law or other authority in support of this argument. The Court remains unconvinced that the Capris lease agreement somehow alleviated Defendants of their respective obligations under the Lease Agreement, Consent to Assignment, and Guarantys. Rather, as will be discussed by the Court more fully in the damages section below, the Court concludes that after Defendants defaulted under their respective agreements, Plaintiff was entitled to treat the Lease Agreement as ended insofar as further performance was concerned and to then maintain this action for damages occasioned by the breach.

C.     **Plaintiff's Breach of Consent to Assignment Claim Against Defendant SJ Restaurants**

The parties stipulated in the Pretrial Order (ECF No. 42), and the Court concludes, that in order to prevail on its breach of the Consent to Assignment claim against Defendant SJ Restaurants, Plaintiff must establish by a preponderance of the evidence, the following: (1) a contractual

relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement; (2) under the Consent to Assignment, Defendant SJ Restaurants contractually obligated itself to remain primarily liable to Plaintiff, for a period of 7 years from the date of the Consent to Assignment, for performance of all of the Tenant's obligations under the Lease Agreement; (3) Plaintiff's performance or willingness to perform in compliance with the Lease Agreement; (4) Defendant Table Rock breached the Lease Agreement by non-payment of rent and/or abandonment of the subject premises, thereby triggering SJ Restaurants' primary liabilities as Tenant under the Lease Agreement; and (5) Plaintiff suffered damages as a result of Defendant Table Rock's breach of the Lease Agreement.

The Court concludes that Plaintiff has established each of these elements by a preponderance of the evidence. First, as the Court previously found, Plaintiff established the first element, namely, the existence of a contractual relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement.

Second, the Court finds that, under the Consent to Assignment, Plaintiff, as Landlord, and Defendant SJ Restaurants, as the original Tenant and assignor, agreed that in consideration for Plaintiff's consent to the assignment of the Lease Agreement from Defendant SJ Restaurants to Defendant Table Rock, Defendant SJ Restaurants and its successors would remain primarily liable to Plaintiff for the performance of Defendant Table Rock's obligations and duties as the Tenant under the Lease Agreement as though Defendant SJ Restaurants remained the Tenant under the Lease Agreement until May 9, 2014.

Third, as the Court previously found, Plaintiff performed or was willing to perform in compliance with the Lease Agreement. No evidence to the contrary was presented to the Court.

Fourth, as the Court previously found, Defendant Table Rock breached the Lease Agreement by non-payment of rent and abandonment of the subject premises. The Court concludes that this breach triggered Defendant SJ Restaurants' primary liabilities as Tenant under the Lease Agreement pursuant to the Consent to Assignment.

Defendant SJ Restaurants, however, argues that it is not liable under the Consent to Assignment because Plaintiff failed to send a Notice of Default directed to Defendant SJ Restaurants. Defendant SJ Restaurants points out that a notice of default is a condition precedent to pursuing damages for a default under the Lease Agreement. However, the Court is not convinced by this argument. The Court notes that the Consent to Assignment itself contains no notice requirements. Further, under Section 26 of the Lease Agreement, Plaintiff is simply required, for a period of two years after Defendant SJ Restaurants assigned its interest in the Lease Agreement to Defendant Table Rock, to notify Defendant SJ Restaurants in writing of any claimed default under the Lease Agreement. Defendant SJ Restaurants then had the right to cure the default, or to commence such cure provided that the cure is thereafter diligently completed, within 15 days of such notice or the applicable grace period under the Lease Agreement, whichever is longer. Plaintiff copied Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems on its Notice of Default to Defendant Table Rock, and Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems admitted that they received this Notice of Default. Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems never attempted to cure the default under the Lease Agreement. The Court therefore concludes that Plaintiff complied with all conditions precedent under the Lease Agreement, and thus that Defendant SJ Restaurants' primary liability as Tenant

under the Lease Agreement pursuant to the Consent to Assignment was triggered by Defendant Table Rock's breach.

Fifth, and finally, as the Court previously found, Plaintiff suffered damages as a result of Defendant Table Rock's breach of the Lease Agreement. The amount of damages suffered by Plaintiff will be discussed below.

### D. Plaintiff's Breach of Guaranty Claims Against Defendants Ozark Restaurants and Restaurant Systems

The parties stipulated in the Pretrial Order (ECF No. 42), and the Court finds, that in order to prevail on its breach of Guaranty claims against Defendants Ozark Restaurants and Restaurant Systems, Plaintiff has the burden of proving by a preponderance of evidence the following: (1) a contractual relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement; (2) Defendants Ozark Restaurants and Restaurant Systems executed guaranties to the Landlord under the Lease Agreement wherein they guaranteed Defendant SJ Restaurants' obligations under the Lease Agreement; (3) Plaintiff's performance or willingness to perform in compliance with the Lease Agreement; (4) Defendant Table Rock breached the Lease Agreement by non-payment of rent and/or abandonment of leased premises, thereby triggering the obligations of Defendants Ozark Restaurants and Restaurant Systems to guaranty the liabilities of Defendant SJ Restaurants as Tenant under the Lease Agreement pursuant to the Consent to Assignment; (5) damages to Plaintiff caused by Defendant Table Rock's breach of the Lease Agreement; and (6) Defendant SJ Restaurants has not paid its liabilities to Plaintiff under the Consent to Assignment.

The Court concludes that Plaintiff has established by a preponderance of evidence each of the elements of her breach of Guaranty claims against Defendants Ozark Restaurants and Restaurant

Systems. First, as previously noted, the Court finds a contractual relationship between Plaintiff or her predecessor in interest and Defendant SJ Restaurants under the Lease Agreement.

Second, the Court finds that Defendants Ozark Restaurants and Restaurant Systems each executed Guarantys wherein they guaranteed Defendant SJ Restaurants' obligations under the Lease Agreement to the Landlord under the Lease Agreement. Under each Guaranty, upon any default in the performance by Tenant of its obligations under the Lease Agreement when due, the Landlord may, if it so desires, proceed directly against Defendants Ozark Restaurants or Restaurant Systems, without any prior demand or notice. In addition, each Guaranty covers not only the performance by Tenant of its obligations, covenants, and agreements under the Lease Agreement, but also all costs and expenses, including reasonable attorney's fees, incurred by Landlord in collecting against Defendants Ozark Restaurants and Restaurant Systems under their Guarantys. Each Guaranty provides that it shall inure to the benefit of the Landlord and its successors and assigns, and continues in full force and effect until Tenant has fully performed all of its obligations, covenants and agreements under the Lease Agreement.

Third, as the Court has already found, Plaintiff performed or was willing to perform in compliance with the Lease Agreement.

Fourth, the Court has also already found that Defendant Table Rock breached the Lease Agreement by non-payment of rent and abandonment of the subject premises. The Court concludes that this breach triggered the obligations of Defendants Ozark Restaurants and Restaurant Systems to guaranty the liabilities of Defendant SJ Restaurants as Tenant under the Lease Agreement pursuant to the Consent to Assignment.

Fifth, as previously noted, the Court finds that Defendant Table Rock's breach of the Lease Agreement caused damages to Plaintiff, the exact amount of which is discussed below.

Sixth, and finally, the Court finds that Defendant SJ Restaurants has not paid its liabilities owed to Plaintiff under the Lease Agreement pursuant to the Consent to Assignment.

### E.    Plaintiff's Damages

The parties argue extensively concerning Plaintiff's damages. Defendants argue that Plaintiff is not entitled to future damages because the Lease Agreement does not contain an acceleration clause, and because Plaintiff did not present sufficient evidence to award future damages. Defendants further argue that Plaintiff did not mitigate her damages, she is not entitled to recover out of pocket expenses with respect to Mr. Navigato's charges, she is not entitled to recover all of her attorney's fees and expenses, and she is not entitled to recover certain amounts for past due rents. The Court will examine each of these arguments in turn.

### 1.    No Acceleration Clause

Defendants contend that Plaintiff is not entitled to damages in the amount of future rents because the Lease Agreement does not contain an acceleration clause. In support of this argument, Defendants rely on the general rule that "[i]n the absence of an acceleration clause, no suit can be brought for future rent. A lessor has the options of suing for rent installments as they come due, suing for several accrued installments, or suing for the entire amount at the end of the lease term."[3] Defendants argue that the Supreme Court of Kansas applied this general principle in *Gordon v. Consolidated Sun Ray, Inc.*[4]

---

[3] 49 Am. Jur. 2d Landlord and Tenant § 642 (2010).

[4] 186 Kan. 772 (Kan. 1960).

The Court disagrees with Defendants. The Supreme Court of Kansas did not apply this principle in *Gordon*, but rather looked to the specific terms of the lease agreement in *Gordon* to determine whether the landlord could recover future rent. In *Gordon*, the landlord sued the tenants for abandonment of the leased premises before the expiration of the twenty-five year lease agreement. The lease agreement specifically provided,

> if lessee should abandon or vacate the premises and should thereupon be in default for payment of any of the moneys agreed to be paid by lessee, lessor might, at his option, re-lease said premises for such rent and upon such terms as he might see fit, and if a sufficient sum should not be realized after payment of the expense of re-leasing and collecting rentals to satisfy the stipulated rent, lessee was to pay and satisfy and such deficiency, and such amount would become due monthly and *would constitute a separate cause of action if suit were brought to recover the same at the option of the lessor.*[5]

A few years after execution of the lease agreement, the leased premises were damaged by fire and were rendered untenantable. Soon thereafter, the tenants abandoned and vacated the leased premises and stop performance of their obligations under the lease agreement. The landlord then brought an action against the tenants, asserting several separate causes of action, including causes of action alleging that under the lease future rents would become due and future taxes would become due. However, the landlord did <u>not</u> seek recovery of these causes of action, but asserted them in order to exercise his right of attachment of the tenants' property.

The lower court denied the tenants' demurrer to the landlord's petition, which argued in part that the landlord's petition sought to enforce the obligations of the lease agreement for the remainder of its term. On appeal, the Supreme Court of Kansas concluded that the trial court was correct in denying the tenants' demurrer to the petition. In so holding, the Supreme Court of Kansas noted that

---

[5] *Gordon*, 186 Kan. at 773 (emphasis in original).

the petition did not seek to recover a money judgment in full on the tenants' obligations under the lease agreement for the remainder of its term.

The Supreme Court of Kansas also noted that the *express provisions* of the lease agreement provided a separate and independent cause of action each month that there was a deficiency. The Supreme Court of Kansas explained that under the specific terms of the lease agreement, the landlord could not recover any deficiency until it had actually occurred. The Supreme Court of Kansas also looked to the rule in Kansas "that where parties by agreement fix the measure of recovery due from one to the other their agreement governs, and abstract principles of law relating to the measure of recovery when agreements are wanting are inapplicable."[6]

Thus, the Supreme Court of Kansas did not hold in *Gordon* that a landlord may not recover future rent without an acceleration clause. Rather, the Supreme Court of Kansas noted that the lease agreement at issue specifically provided a separate and independent cause of action each month that there was a deficiency. Unlike in *Gordon*, the Lease Agreement here contains no such provision.

Instead of looking to the *Gordon* case, the Court concludes that the applicable case in determining whether Plaintiff may recover damages for future rents is *Wilson v. National Refining Co.*[7] In *Wilson*, the landlord sued the tenant "to recover damages for the abandonment of the leased premises and refusal to pay the rent for the last two years and more of a five-year period covered by the lease."[8] The tenant argued that the landlord's action was prematurely brought because it was

---

[6] *Id.* at 775.

[7] 126 Kan. 139, 266 P. 941 (Kan. 1928)

[8] *Wilson*, 266 P. at 942.

commenced five months before the five-year period covered by the lease expired. In examining this argument, the Supreme Court of Kansas explained,

>  Where there is a breach of the terms of the lease and an abandonment of the leased premises . . . the lessor, if he does not accept the surrender of the lease, has several different remedies: 'Where there has been a renunciation of an executory contract by one party, the other party has a right to elect between the following remedies: (1) To rescind the contract and pursue the remedies based on such a rescission. (2) To treat the contract as still binding and wait until the time arrives for its performance, and at such time to bring an action on the contract for breach. (3) To treat the renunciation as an immediate breach and sue at once for any damages he may have sustained.'"[9]

The Supreme Court of Kansas further explained, "The appellant's contention that the action is prematurely brought depends upon whether the plaintiff's petition is one to collect the rent under the terms of the lease, which was payable monthly in advance, or one for damages for the breach of a contract."[10] The Supreme Court of Kansas concluded that if the landlord's petition was one for the collection of rent, then it was premature as far as the last five months were concerned.

However, the Supreme Court of Kansas noted that the allegations in the petition demonstrated that the landlord was seeking to recover damages for breach of contract, even though the damages were measured by the amount of rent due under the lease. The Supreme Court of Kansas declared that if the action is one for damages, then it may be commenced immediately upon the breach and abandonment, and damages may be sought for the entirety of the lease term. In reaching this conclusion, the Supreme Court of Kansas explained:

>  Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has, according to the great weight of authority, [an] option to treat the contract as ended so far as further performance is concerned,

---

[9] *Id.* (quoting 13 C. J. 653).

[10] *Id.*

and to maintain an action at once for the damages occasioned by such anticipatory breach.[11]

The tenant in *Wilson* also argued that by reletting the premises, the landlord accepted the tenant's surrender of the premises, thereby relieving the tenant from further liability under the lease. The Supreme Court of Kansas dismissed this argument, holding, "Under no circumstances does the reletting in and of itself amount to a consent to the surrender or an acceptance of the surrender."[12] The Supreme Court of Kansas explained, "Surrender by a tenant must have the consent of his landlord, in order that the tenant may be discharged from liability to pay rent. . . . Consent of the landlord is not implied from the mere fact of a reletting . . .."[13]

Here, as in *Wilson*, there is no evidence that Plaintiff accepted Defendant Table Rock's surrender of the subject premises. Defendant Table Rock never provided Plaintiff with any notice that it was abandoning the subject premises. Upon learning of Defendant Table Rock's default under the Lease Agreement, Plaintiff sent Defendant Table Rock a Notice of Default demanding that Defendant Table Rock cure its default, and if such default was not cured, declaring that Plaintiff would pursue all rights available to her under the terms of the Lease Agreement including termination of the lease and eviction of Defendant Table Rock. Shortly after sending the Notice of Default, Plaintiff learned that Defendant Table Rock had abandoned the subject premises. Plaintiff then took control of the subject premises, treated the lease as terminated insofar as further performance was concerned, began her attempts to lease or sell the subject premises, and brought this action for damages due to Defendant Table Rock's breach of the Lease Agreement.

---

[11] *Id.* (citations and quotations omitted).

[12] *Id.*

[13] *Id.* (citations and quotations omitted).

Defendants argue that Plaintiff did not terminate the Lease Agreement and seek damages for future rent because Mr. Maloney, Plaintiff's real estate agent, inserted the following comment into the local MLS listing of the subject premises, "Building is in litigation with KFC for termination of lease. Building might be able to be sold but would require both parties to agree." The parties referred to by Mr. Maloney were Plaintiff and Defendant Table Rock. Mr. Maloney explained that he inserted this comment into the listing because at the time he believed such agreement would be necessary. Defendants argue that this comment in the MLS listing shows that Plaintiff treated the Lease Agreement as ongoing. The Court is not persuaded by this argument. The fact that Plaintiff's real estate agent was mistaken as to whether the subject premises could be sold without Defendant Table Rock's agreement does not demonstrate that Plaintiff treated the Lease Agreement as ongoing. Rather, Plaintiff has consistently and continuously pursued her rights against Defendants, treated the Lease Agreement as terminated insofar as performance is concerned, attempted to lease or sell the subject premises, and pursued a claim for damages against Defendants.

The Court concludes that Plaintiff, like the landlord in *Wilson*, is entitled under Kansas law to pursue an action for damages for Defendant Table Rock's breach of the Lease Agreement, and consequently Defendant SJ Restaurants' breach of the Consent to Assignment and Defendants Ozark Restaurants' and Restaurant Systems' breach of their Guarantys, even if the damages are measured by the amount of rent due under the Lease Agreement for the entirety of the lease term.

### 2. *Plaintiff's Evidence Concerning Her Future Damages*

Defendants argue that Plaintiff's evidence is insufficient to award future damages. In Kansas, "[d]amages need not be established with absolute certainty. Nevertheless, a damages claim

must be supported by evidence that is not conjectural or speculative."[14]  Plaintiff has the burden of establishing a reasonable basis for computation of her damages.[15]

With respect to Plaintiff's evidence of her future damages, it appears that the parties disagree as to (a) the calculation of estimated mitigating rental income by Plaintiff's expert, (b) whether the second scenario conducted by Plaintiff's expert is an appropriate measure of future damages, and (c) the discount rate to be applied to Plaintiff's future damages.

*(a)     Estimated Mitigating Rental Income*

The Court has considered Plaintiff's evidence concerning her future damages, including the opinion of Plaintiff's expert Jay R. Hill.  The Court has also considered the testimony and opinion of Kenneth Jaggers, Defendants SJ Restaurants', Ozark Restaurants', and Restaurant Systems' expert.  In light of this evidence, the Court finds that Mr. Hill's calculation of $1,000 estimated mitigating rental income to be credible.

In calculating the estimated mitigating rental income, Mr. Hill considered the lease rate for Capris, the A&A Appraisal of the subject premises, conversations with Mr. Gerald R. Maier, J.D., CPA, MAI of Mainland Valuation, Overland Park, Kansas, and conversations with Mr. Keith Maloney.  The Court also notes that the lease agreement being negotiated by Plaintiff and Mi Tierra at the time of trial provides for $1,000.00 monthly rent for the second year of the lease.  Moreover, Mr. Jaggers never offered an opinion as to whether the estimated mitigating rental income of $1,000

---

[14] *Southwind Exploration, LLC v. Street Abstract Co.*, 42 Kan.App.2d 122, 130 (Kan. Ct. App. 2009) (citations omitted).

[15] *Kansas ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 789 (Kan. 2005) (citations omitted).

was correct. The Court thus finds that Plaintiff has demonstrated a reasonable basis for concluding that the estimated mitigating rental income of $1,000 is appropriate.

*(b)      Mr. Hill's Second Scenario*

In his second scenario, Mr. Hill assumed that Plaintiff sold the subject premises on August 1, 2010 for $124,000, the value for which the property was appraised on January 10, 2010 by Plaintiff's expert, Mr. Allen McColm. Mr. Hill then calculated the future lost rent income using the contracted rental amounts for the periods in question (August 1, 2010 to May 9, 2014, and August 1, 2010 to February 8, 2025) plus the estimated fair market value of the building. In this second scenario, Mr. Hill assumed that the subject premises was sold at its depressed value because of Defendants' actions, and therefore Mr. Hill calculated the future value of the building and added it to this calculation. Mr. Hill then applied a discount rate of 11 percent to determine the present value of the lost net rent income.

The Court has considered Mr. Hill's second scenario used to calculate Plaintiff's future damages and finds that this scenario is far to speculative and conjectural to form the basis of Plaintiff's future damages. In reaching this conclusion, the Court notes that Mr. Hill borrowed extensively from Mr. McColm. This is likely because Mr. Hill is not a certified real estate appraiser. In his second scenario, Mr. Hill used the appraisal by Mr. McColm to conclude that the value for the subject premises as of August 1, 2010 was $124,000. In addition, Mr. Hill calculated the future value of the building using the same income approach and value factor used by Mr. McColm.

Mr. Jaggers, on the other hand, is a state certified real estate and real property appraiser, and is MAI certified, which is the highest designation a person can receive as a real estate appraiser with the Appraisal Institute, the largest professional organization that includes real estate appraisers. Mr.

Jaggers testified that in his 20 years of appraisal work, he has never seen an evaluation such as that done by Mr. Hill in his second scenario. He opined that Mr. Hill's approach in the second scenario is incorrect. The Court finds Mr. Jaggers' opinion persuasive.

In his report, Mr. Jaggers explained that Mr. Hill, in his second scenario, assumes a sale of the building in addition to the discounted rent loss combined as evidence of the loss. This approach brings to Mr. Hill's determination of lost rents all of the externalities affecting the real estate irrespective of the Lease Agreement, Consent to Assignment, and Guarantys. The lessee or guarantor has no rights in the resale of the property when its lease obligation ceases. Nor does the lessee or guarantor participate in any return of capital. Inherent in the return of capital are ownership risks which are borne by the owner or investor, not the tenant. Mr. Jaggers thus concluded, and the Court agrees, that the externalities which are reflected in the sale price of the real estate are incorrectly included in Mr. Hill's analysis.

The Court therefore concludes that Mr. Hill's second scenario does not provide a reasonable basis for computation of Plaintiff's claim for future damages. The Court will therefore rely exclusively on Mr. Hill's first scenario.

(c)     <i>Discount Rate</i>

The parties disagree as to the appropriate discount rate to be applied to Plaintiff's future damages calculation in Mr. Hill's first scenario. Having reviewed the relevant evidence and opinions, the Court finds Mr. Jaggers' opinion as to the appropriate discount rate to be credible and more persuasive that the opinion offered by Mr. Hill. Mr. Jaggers opined that the appropriate discount rate to be applied to Plaintiff's future damages calculation was 10.3 percent, as opposed to the 7.5 percent used by Mr. Hill.

Mr. Jaggers, in reaching this opinion, conducted extensive research of numerous databases in order to come up with a market derived discount rate. Mr. Jaggers searched Integra Realty Resources national Datapoint database and other sources for recent sales of similar properties. He also reviewed an Industry Data Report – Franchise Finance and Valuation Update – January 2010, which provides the results of surveys of investors and lenders on a variety of data including lending rates, equity requirements, loan terms and capitalization rates. In addition, he researched the relationship between capitalization rates and discount rates based upon national surveys conducted by Integra Realty Resources and Korpacz. Finally, Mr. Jaggers also looked to discount rates for retail properties.

Mr. Hill's explanation of why he used a discount rate of 7.5 percent was more speculative, and his reasoning was unclear to the Court. Mr. Hill testified that he used the best case scenario of the risk free rate as a starting point. He then explained that, "since the market appears to be unstable . . . but, given the fact that the market may turn around, I went ahead and increased the discount rate by 3 ½ percent to account for that maybe they will recover, you know, 10 years down the line." In his report, Mr. Hill also explained, "In determining a reasonable rate, I start with a risk-free rate. . . . As will be seen below, the rate used by the appraiser for this property is 10.4 % which anticipates all risks associated with the property. I believe a rate half way between the risk-free rate and the 10.5% (rounded) rate or 7.5% is appropriate for this calculation."

The Court finds Mr. Hill's calculation of the appropriate discount rate to be a bit speculative. Further, the process employed by Mr. Jaggers provides a far more persuasive and reasonable basis for determining the appropriate discount rate. The Court thus concludes that the appropriate discount rate to be applied to Plaintiff's future damages calculation is 10.3 percent.

### 3. *Mitigation of Damages*

Defendants argue that Plaintiff failed to mitigate her damages. The rules governing Plaintiff's duty to mitigate her damages in Kansas were set forth in *Lindsley v. Forum Restaurants, Inc.*:[16]

> Where a tenant, under contract to pay rent on real property, abandons the property and notifies the landlord of that abandonment, it is the landlord's duty to make a reasonable effort to secure a new tenant and obtain rent before he can recover from the old tenant under the contract so as to lessen the injury. []
>
> It is a general rule of law that one injured by reason of breach of contract by another is under a duty to exercise reasonable care to avoid loss or to mitigate and minimize the resulting damage. Such reasonable care does not require a party to execute a new or different contract. []
>
> The duty to mitigate damages is not an unlimited one and an injured party is required only to exert reasonable efforts to prevent or minimize his damages within the bounds of common sense. [][17]

In *Lindsley*, the court found that the landlord exercised reasonable mitigation efforts and was entitled to full recovery for rent and damages. In so concluding, the *Lindsley* court considered the landlord's attempts to relet the premises:

> Upon receipt of defendant's letter notifying him of the abandonment of the premises, plaintiff contacted Weigand [leasing company], who is recognized by both parties to be among the best qualified in his field, and urged him to be as diligent as possible in securing a tenant. Plaintiff made contacts with other realtors and sought the assistance of a local banker. He had extra keys made to permit inspection of the premises. The evidence reveals that the vacancy was advertised and the premises were shown to various prospective tenants. Plaintiff transmitted all proposals of which he had knowledge for the approval of defendant. He did not reject any offers to relet the property, as none were received.[18]

---

[16] 3 Kan.App.2d 489 (Kan. Ct. App. 1979).

[17] *Id.* at Syl. ¶¶ 3, 4, 5.

[18] *Id.* at 492.

Defendants have the burden to prove that Plaintiff failed to exercise reasonable efforts to mitigate her damages.[19] "The determination of reasonable mitigation entails a case-by-case factual examination of the totality of the circumstances."[20] Considering the totality of the circumstances in this case, the Court concludes that Plaintiff mitigated her damages. Plaintiff was only required to exercise reasonable mitigation efforts, which Plaintiff did. Defendant Table Rock failed to pay its November 2008 rent and its December 2008 rent. After Defendant Table Rock's default under the Lease Agreement, Plaintiff retained Richard Tucker, an attorney, to pursue her legal remedies against Defendants. In addition, within days of being late on its December 2008 payment, Plaintiff sent a Notice of Default to Defendant Table Rock, demanding that Defendant Table Rock cure the default.

In the last week of December 2008, Plaintiff learned that Defendant Table Rock had abandoned the subject premises. Thus, Plaintiff traveled to the subject premises in late January 2009, secured the premises, and advertised the subject premises in LoopNet as well as advertising the subject premises for lease or for sale by putting a message up on the reader board located at the subject premises itself. Further, while visiting the subject premises in late January 2009, Plaintiff, through her designated agent Chris Navigato, interviewed Keith Maloney of Finley-Maloney Real Estate L.L.C., a real estate brokerage and real estate sales company located in Parsons, Kansas, regarding marketing the subject premises. In addition, on January 29, 2009, Plaintiff, through her

---

[19] *Rockey v. Bacon*, 205 Kan. 578, Syl. ¶ 6 (Kan. 1970) ("Mitigation of damages is an affirmative defense and the burden of proving a failure to mitigate losses devolves upon the party who asserts it.").

[20] *Leavenworth Plaza Assocs., L.P. v. L.A.G. Enters.*, 28 Kan.App.2d 269, 272 (Kan. Ct. App. 2000) (citations omitted).

counsel Richard Tucker, filed a civil action against Defendants Table Rock, SJ Restaurants, Ozark Restaurants and Restaurant Systems in Labette County, Kansas District Court seeking remedies for breach of the Lease Agreement, Consent to Assignment, and Guarantys.

Then, on March 15, 2009, Mr. Maloney, pursuant to an agreement with Plaintiff, began marketing the subject premises for sale or for rent. After being retained by Plaintiff, Mr. Maloney marketed the subject premises locally for five months, from March of 2009 to July of 2009, including listing the subject premises with the local MLS, adding the subject premises to a local real estate guide when it came up as a two-month publication, advertising the subject premises in the local newspaper, and listing the subject premises on his company website. Mr. Maloney also contacted Yum! Brands corporate headquarters.

Thanks to these efforts, Plaintiff was able to locate another tenant – Capris. Unfortunately, Capris defaulted on its lease agreement. After Capris defaulted under its lease agreement, Plaintiff retained Mr. Tucker to proceed with collection efforts against Capris, and on July 12, 2010, Plaintiff filed a lawsuit in the District Court of Labette County, Kansas against Capris, seeking lease payments for the full term of the lease, which was fifteen months, in the amount of $31,302.

In addition to pursuing its claim against Capris, Plaintiff began advertising the subject premises for sale again. In March of 2010, Plaintiff began the LoopNet advertisement again and Mr. Maloney began marketing the subject premises again for either sale or lease. The subject premises was initially listed in March 2010 for lease for $2,500.00 per month, however a few months later, per Mr. Maloney's suggestion, Plaintiff reduced the advertised lease rate to $785.00 triple net monthly.

As of the date of the trial, July 26, 2010, Plaintiff did not receive any offers to purchase or any inquiries regarding purchasing the subject premises. However, as of the date of the trial, thanks to Plaintiff's mitigation efforts, Plaintiff was in negotiations with Mi Tierra to lease the subject premises.

In light of these circumstances, the Court concludes that Plaintiff exercised reasonable efforts to mitigate her damages, and that Defendants have failed to demonstrate otherwise.

### 4. *Out of Pocket Expenses for Chris Navigato*

Defendants argue that Plaintiff is not entitled to out of pocket expenses incurred due to Chris Navigato's charges to the Giurbino 2005 Irrevocable Trust. The Lease Agreement contains an enforcement provision, which provides,

> In the event either party to the Lease Agreement obtains legal counsel and/or commences legal proceedings to enforce any right under this Lease or to obtain relief for the breach of any term, condition or covenant herein, the party ultimately prevailing (or substantially prevailing) in such proceedings shall be entitled to recover from the other party the reasonable costs and expenses of such proceedings, including reasonable attorney fees.

Plaintiff does not, however, appear to rely on this provision in support of her claim for Chris Navigato's charges to the Giurbino 2005 Irrevocable Trust. Rather, Plaintiff appears to rely on Kansas law for her claim that Defendants should be liable for the reasonable expenses incurred by Plaintiff in attempting to mitigate her damages, including Mr. Navigato's charges to the Trust.

As an initial matter, the Court concludes that Plaintiff cannot rely on the enforcement provision in the Lease Agreement to justify her claim for Chris Navigato's charges. The Court finds that Mr. Navigato's charges to the Trust do not constitute "reasonable costs and expenses of such [legal] proceedings." Thus, the Court must look to Kansas law to determine whether Plaintiff is entitled to recover these out of pocket expenses.

It appears to the Court that certain expenses incurred by Plaintiff in attempting to mitigate her damages are recoverable under Kansas law. The Supreme Court of Kansas, in *Gordon v. Consolidated Sun Ray, Inc.*,[21] affirmed the lower court's finding that the lessor was entitled to recover $5,000 for expenses for real estate commission in finding a new tenant and releasing the premises. The Court thus concludes that Plaintiff is entitled to recover the reasonable expenses incurred by Plaintiff in attempting to mitigate her damages, including costs of marketing and advertising, real estate commissions, upkeep and maintenance of the subject premises, and attorney's fees.

However, the Court concludes that many of the costs incurred by Plaintiff for Chris Navigato's charges do not constitute reasonable expenses. Plaintiff seeks a total of $44,172.90 for out of pocket expenses. This total amount includes charges by Mr. Navigato to the Trust. Mr. Navigato, Plaintiff's husband, charged the Trust $175.00 per hour for his services, and he also charged the Trust for the expenses he incurred in providing those services, such as airfare, car rental, meals, and lodging. It appears that Plaintiff paid $9,831.54 to Chris Navigato for his professional services to Plaintiff, including "communication with tenant on the lease default," "review documents and strategies," "teleconference with attorney about lease," "property tax reduction, talking to county clerk," "prepare and review lease agreement for Capris," "prepare financial documentation for trial," and "communicate with attorney on default and litigation." It appears that Mr. Navigato charged Plaintiff as much as her counsel did, and often his services directly overlapped the services provided by Plaintiff's counsel. For example, Plaintiff was billed for both her counsel's services and Mr. Navigato's services every time they had a conversation or worked together on a new lease

___

[21] 195 Kan. 341 (Kan. 1965).

48

for the subject premises. The Court concludes that these expenses are not reasonable expenses that Plaintiff is entitled to recover.

In addition, Plaintiff incurred $1,051.52 in February 2010 for Chris Navigato to fly to Kansas City first class and rent a sport utility vehicle, and $468.36 for Chris Navigato to spend two nights at the Hyatt Regency Crown Center. Plaintiff also incurred $1,932.28 in July 2010 for Chris Navigato and Michelle Navigato to fly to Kansas City first class, and $576.64 for two nights at the Westin Crown Center. The Court concludes that these expenses for first class airfare and for lodgings at the Hyatt Regency Crown Center and Westin Crown Center are not reasonable expenses incurred by Plaintiff in her attempt to mitigate her expenses.

The Court thus concludes that Plaintiff is entitled to recover her out of pocket expenses, less these amounts billed by Mr. Navigato. Thus, Plaintiff is entitled to recover out of pocket expenses in the amount of $30,312.56.

### 5.    *Plaintiff's Attorney's Fees*

Defendants argue that Plaintiff is not entitled to recover all of her attorney's fees because Plaintiff incurred certain fees solely because she is seeking future rents, to which Defendants claim she is not entitled. However, the Court has already concluded that Plaintiff is entitled to damages in the amount of future rents. The Court therefore dismisses this argument.

As the Court previously found, Plaintiff is entitled to recover the reasonable expenses incurred by Plaintiff in attempting to mitigate her damages, including her attorneys' fees incurred: $2,810.41 for Tucker and Markham; $29,468.09 for McAnany, Van Cleave & Phillips; and $5,375.00 for William Bissell.[22]

---

[22] *See Gordon,* 195 Kan. 341.

### 6. Past Due Rent

Plaintiff points to her expert Mr. Hill's report to support her claim for lost net rent income from November 2008 to August 1, 2010. The principal balance of unpaid rent for the period of November 2008 through July 2010, is $116,074.00. This figure includes offset or reduction for all rent received by Plaintiff and from subsequent lessee(s) of the subject premises. Adding prejudgment interest at the contractual rate set out in the Lease Agreement, the amount of rent owed as of the end of July 2010 is $119,654.00.

Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems argue that Plaintiff is not entitled to the full amount of past due rent because there were times during the period of November 2008 to August 1, 2010 where Plaintiff failed to mitigate her damages. However, the Court has already concluded that Plaintiff did mitigate her damages.

Defendants also argue that the past due rent amount includes $31,302 in rent that Plaintiff is also attempting to collect from the tenants on the Capris' lease. However, Plaintiff explains that she has not yet been able to collect this amount from Capris and it is highly unlikely that Plaintiff will ever be able to collect this amount from Capris. Furthermore, Defendants do not point to any authority requiring the Court to reduce Plaintiff's damages claim by amounts that Plaintiff has not received and will not likely ever receive.

The Court therefore concludes that Plaintiff has satisfied her burden of establishing her claim for past due rent damages in the amount of $119,654.00 for the period of November 2008 through August 1, 2010.

### 7. Plaintiff's Total Damages

By way of summary, the Court concludes that Plaintiff is entitled to judgment against Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, jointly and severally, for past due rent damages for the period of November 2008 to August 1, 2010 in the amount of $119,654.00. The Court further concludes that Plaintiff is entitled to judgment against Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, jointly and severally, for lost net rent income from August 1, 2010 to May 9, 2014, using Mr. Hill's $1,000 mitigating rental income rate, using Mr. Jaggers 10.3 percent discount rate, and not using Mr. Hill's second scenario. **<u>Within 20 days</u>** of the date of this Memorandum and Order, Plaintiff shall provide the Court with an affidavit showing the calculation and total amount of lost net rent income from August 1, 2010 to May 9, 2014. Defendants shall have **<u>10 days</u>** after the filing of Plaintiff's affidavit to object to Plaintiff's calculations.

The Court further concludes that Plaintiff is entitled to judgment against Defendant Table Rock for lost net rent income from May 10, 2014 to February 8, 2025, using Mr. Hill's $1,000 mitigating rental income rate, using Mr. Jaggers 10.3 percent discount rate, and not using Mr. Hill's second scenario. **<u>Within 20 days</u>** of the date of this Memorandum and Order, Plaintiff shall provide the Court with an affidavit showing the calculation and total amount of lost net rent income from May 10, 2014 to February 8, 2025. Defendants shall have **<u>10 days</u>** after the filing of Plaintiff's affidavit to object to Plaintiff's calculations.

The Court further concludes that Plaintiff is entitled to judgment against Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, jointly and severally, for out of pocket expenses, less certain amounts billed by Mr. Navigato, for a total of $30,312.56.

The Court also concludes that Plaintiff is entitled to judgment against Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, jointly and severally, for her attorney's fees as follows: $2,810.41 for Tucker and Markham; $29,468.09 for McAnany, Van Cleave & Phillips; and $5,375.00 for William Bissell

**F.     Defendants SJ Restaurants', Ozark Restaurants', and Restaurant Systems' Claims Against Defendant Table Rock**

Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems each assert counterclaims of indemnity against Defendant Table Rock under the Asset Purchase Agreement and the Assignment and Assumption of Lease.

The Court finds that Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems, are entitled to judgment on their claims of indemnity against Defendant Table Rock. All essential elements of those claims have been established by a preponderance of the evidence. Specifically, there is a contractual relationship between Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems and Defendant Table Rock pursuant to the Asset Purchase Agreement and the Assignment and Assumption of Lease. In addition, Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems performed their obligations pursuant to the Asset Purchase Agreement and the Assignment and Assumption of Lease. The Court further finds that Defendant Table Rock breached its obligations pursuant to the Asset Purchase Agreement and the Assignment and Assumption of Lease by failing to defend and indemnify Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems against Plaintiff's claims arising from Defendant Table Rock's non-payment of rent and abandonment of the subject premises. Finally, Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems sustained damages as a direct result of Defendant Table Rock's breach of the Asset Purchase Agreement and the Assignment and Assumption of Lease. The

Court therefore concludes that Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems are entitled to judgment against Defendant Table Rock for the entire amount for which Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems are liable to Plaintiff.

**IT IS THEREFORE ORDERED** that, upon receipt of Plaintiff's affidavit of damages without objection of Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, judgment shall be entered for Plaintiff against Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock on all of Plaintiff's claims.

**IT IS FURTHER ORDERED** that, upon receipt of Plaintiff's affidavit of damages without objection of Defendants SJ Restaurants, Ozark Restaurants, Restaurant Systems, and Table Rock, judgment shall be entered for Defendants SJ Restaurants, Ozark Restaurants, and Restaurant Systems against Defendant Table Rock on all of Defendants SJ Restaurants', Ozark Restaurants', and Restaurants Systems' counterclaims.

**IT IS SO ORDERED**.

Dated in Kansas City, Kansas on this 10th day of January 2011.

s/ David J. Waxse\
David J. Waxse\
U.S. Magistrate Judge

cc:     All counsel and *pro se* parties